United States District Court
Southern District of Texas
**ENTERED**
March 23, 2017
David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| DAVID ERON BOUKNIGHT, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:13-CV-451 |
| | § | |
| MIKE ROESLER, *et al.*, | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Plaintiff David Eron Bouknight is a parolee who has filed a civil rights lawsuit alleging that he was injured when a heavy chow hall table fell on him while he was incarcerated at the Terrell Unit of the Texas Department of Criminal Justice ("TDCJ"). Bouknight claims that the table had not been adequately inspected or maintained despite posing an obvious danger to inmates. He further alleges that the medical personnel who treated him for his injuries were deliberately indifferent to his serious medical needs. In his live complaint, Bouknight names nine defendants (Dkt. 33 at pp. 3–4).

The Court requested a *Martinez* report[1] from the Texas Attorney General's office, which the Attorney General's office provided (Dkt. 52). The Court construed the *Martinez* report as a motion for summary judgment filed on behalf of the defendants and notified Bouknight of that construction (Dkt. 53). Bouknight filed a response (Dkt. 54). After

---

[1]    *Martinez v. Aaron*, 570 F.2d 317 (10th Cir. 1987); *see also Cay v. Estelle*, 789 F.2d 318, 323 & n.4 (5th Cir. 1986) (discussing the utility of a *Martinez* report).

reviewing all of the evidence submitted, the parties' briefing, and the applicable law, the Court concludes that the defendants' motion for summary judgment must be granted for the reasons that follow.

## I.   **BACKGROUND**

In his live complaint, Bouknight alleges that he suffered injuries to his back, hip, and left knee on November 7, 2011 "when a 300–400 lb. steel dining table broke at the base and fell over with [him]" (Dkt. 33 at pp. 5–6). Bouknight further alleges that the table's base rusted out and collapsed because it "is subjected to constant moisture from the washing and cleaning of the floor after meals" (Dkt. 33 at p. 5). According to Bouknight, few inspections and little maintenance have been performed on the chow hall tables, and the table that injured him in fact broke a second time soon after it was repaired (Dkt. 33 at pp. 5–6). Bouknight generally alleges that there were "problems with . . . breaking tables[,]" by which he apparently means that other similar incidents should have alerted Terrell Unit officials that the chow hall tables posed a danger to inmates (Dkt. 33 at p. 3). He does not, however, cite any specific instances of falling tables injuring other inmates.

The nine defendants can essentially be divided into three categories: (1) Terrell Unit officials who "[were] aware of the problems with the breaking tables but failed to act on [them;]"[2] (2) medical providers who showed deliberate indifference to Bouknight's medical

---

[2]   These defendants are Warden Mike Roesler; Food Service Manager John Dudley; Lieutenant Paul Hill; Maintenance Supervisor Ray Word; and Safety Officer Jacqueline Sanders.

needs;[3] and (3) one grievance investigator who "[f]ailed to answer" Bouknight's grievances and other requests for relief and information regarding the accident[4] (Dkt. 33 at pp. 3–4).

## II.    THE PLRA AND SUMMARY JUDGMENTS

### A.    The PLRA

The complaint in this case is governed by the Prison Litigation Reform Act (the "PLRA"). Upon initial screening of a prisoner civil rights complaint, the PLRA requires a district court to scrutinize the claims and dismiss the complaint, in whole or in part, if it determines that the complaint "is frivolous, malicious, or fails to state a claim upon which relief may be granted;" or "seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b). The PLRA also provides that the court "shall on its own motion or on the motion of a party dismiss an action" if it is satisfied that the complaint is "frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant who is immune from such relief." 42 U.S.C. § 1997e(c).

Bouknight proceeds *pro se* in this case. Courts construe pleadings filed by *pro se* litigants under a less stringent standard of review. *Haines v. Kerner*, 404 U.S. 519 (1972) (per curiam). Under this standard, "[a] document filed *pro se* is 'to be liberally construed,' *Estelle* [*v. Gamble*, 429 U.S. 97, 106 (1976)], and 'a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.'"

---

[3]    These defendants are Senior Practice Manager Paul Strunk; Dr. Kwabena Owusu; Johny Abraham, a Registered Nurse and Family Nurse Practitioner; and Hill again.

[4]    This is Susan Rivas.

*Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Nevertheless, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (observing that courts "are not bound to accept as true a legal conclusion couched as a factual allegation"). The Supreme Court has clarified that "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

### B.    Rule 56

The Texas Attorney General's office has filed a *Martinez* report, which the Court construes as a motion for summary judgment filed on behalf of the defendants. Federal Rule of Civil Procedure 56 mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing of the existence of an element essential to the party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In deciding a motion for summary judgment, the Court must determine whether the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

*Id.* at 322–23.

For summary judgment, the initial burden falls on the movant to identify areas essential to the non-movant's claim in which there is an absence of a genuine issue of material fact. *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005). The movant, however, need not negate the elements of the non-movant's case. *See Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005). The movant may meet its burden by pointing out the absence of evidence supporting the non-movant's case. *Duffy v. Leading Edge Products, Inc.*, 44 F.3d 308, 312 (5th Cir. 1995).

If the movant meets its initial burden, the non-movant must go beyond the pleadings and designate specific facts showing that there is a genuine issue of material fact for trial. *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 282 (5th Cir. 2001). "An issue is material if its resolution could affect the outcome of the action. A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *DIRECT TV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2006) (citations omitted).

In deciding whether a genuine and material fact issue has been created, the facts and inferences to be drawn from those facts must be reviewed in the light most favorable to the non-movant. *Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410, 412 (5th Cir. 2003). However, factual controversies are resolved in favor of the non-movant "only when both parties have submitted evidence of contradictory facts." *Alexander v. Eeds*, 392

F.3d 138, 142 (5th Cir. 2004) (citation and quotation marks omitted). The non-movant's burden is not met by mere reliance on the allegations or denials in the non-movant's pleadings. *See Diamond Offshore Co. v. A & B Builders, Inc.*, 302 F.3d 531, 545 n.13 (5th Cir. 2002). Likewise, "conclusory allegations" or "unsubstantiated assertions" do not meet the non-movant's burden. *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 399 (5th Cir. 2008). Instead, the non-movant must present specific facts which show the existence of a genuine issue concerning every essential component of its case. *Am. Eagle Airlines, Inc. v. Air Line Pilots Ass'n, Int'l*, 343 F.3d 401, 405 (5th Cir. 2003). In the absence of any proof, the Court will not assume that the non-movant could or would prove the necessary facts. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).

Affidavits cannot preclude summary judgment unless they contain competent and otherwise admissible evidence. *See Love v. Nat'l Medical Enterprises*, 230 F.3d 765, 776 (5th Cir. 2000); *Hunter-Reed v. City of Houston*, 244 F.Supp.2d 733, 745 (S.D. Tex. 2003). A party's self-serving and unsupported statement in an affidavit will not defeat summary judgment where the evidence in the record is to the contrary. *Smith v. Southwestern Bell Tel. Co.*, 456 Fed. App'x 489, 492 (5th Cir. 2012) ("[W]e have repeatedly held that self-serving statements, without more, will not defeat a motion for summary judgment, particularly one supported by plentiful contrary evidence."); *United States v. Lawrence*, 276 F.3d 193, 197 (5th Cir. 2001); *In re Hinsley*, 201 F.3d 638, 643 (5th Cir. 2000); *see also Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which

-6-

is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

Lastly, Rule 56 does not impose upon the Court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment; evidence not referred to in the response to the motion for summary judgment is not properly before the Court, even if it exists in the summary judgment record. *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003). Although Bouknight is proceeding pro se, "the notice afforded by the Rules of Civil Procedure and the local rules" is considered "sufficient" to advise a pro se party of his burden in opposing a summary judgment motion. *Martin v. Harrison County Jail*, 975 F.2d 192, 193 (5th Cir. 1992).

### III.   BOUKNIGHT HAS NOT PRESENTED EVIDENCE OF DELIBERATE INDIFFERENCE TO HIS SAFETY.

Bouknight alleges that Roesler, Dudley, Hill, Word, and Sanders violated his rights under the Eighth Amendment by failing to prevent the rusting table bases in the chow hall from becoming a danger to him and other inmates (Dkt. 33 at pp. 5–6).

#### A.   Prisoners and safety—the legal standard

Under the Eighth Amendment, prisoners have a right to "humane conditions of confinement[,]" and prison officials are required to provide the prisoners with adequate food, shelter, clothing, and medical care. *Herman v. Holiday*, 238 F.3d 660, 664 (5th Cir. 2001) (quotation marks omitted). Prison officials must take reasonable measures to guarantee the

safety of the inmates. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). However, the Eighth Amendment mandates *reasonable* safety, not *absolute* safety; and prison officials are not liable when they make good-faith errors in assessing a potential danger. *Newton v. Black*, 133 F.3d 301, 308 (5th Cir. 1998). Not every injury suffered by a prisoner translates into Constitutional liability for prison officials responsible for the inmate's safety. *Farmer*, 511 U.S. at 834. Rather, Bouknight must show that the defendants were deliberately indifferent to his safety. *Estelle v. Gamble*, 429 U.S. 97, 105–06 (1976).

The standard for deliberate indifference is extremely high and requires more than a showing that the defendants were negligent or mistaken in their judgment. *Id.*; *Domino v. Texas Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 1999). To establish deliberate indifference in a prison conditions case, a prisoner must show that the prison officials: (1) were aware of facts from which an inference of an excessive risk to the prisoner's health or safety could be drawn; and (2) actually drew an inference that such potential for harm existed. *Palmer v. Johnson*, 193 F.3d 346, 352 (5th Cir. 1999). The deliberate-indifference standard is designed to be stringent enough to separate acts or omissions that amount to intentional choices from those that are merely unintentionally negligent oversights. *Southard v. Tex. Bd. Of Criminal Justice*, 114 F.3d 539, 551 (5th Cir. 1997). To that end, it draws on the test for "subjective recklessness" used in criminal law, which "generally permits a finding of recklessness only when a person disregards a risk of harm of which he is aware" and does not permit such a finding based on mere "failure to alleviate a significant risk that [the

-8-

person] should have perceived but did not[.]" *Farmer*, 511 U.S. at 836–40.

In short, it is not enough that Bouknight was injured by the falling table, or even (for the sake of argument) that the defendants were negligent in allowing the table to fall. In order to establish an Eighth Amendment violation, Bouknight must show that the defendants knowingly exposed him to and consciously disregarded a substantial risk of serious harm. *Brewer v. Dretke*, 587 F.3d 764, 770 (5th Cir. 2009).

### B.    Bouknight's claims and evidence

The Court will grant summary judgment on the claims against Roesler, Dudley, Hill, Word, and Sanders for deliberate indifference to his safety. The Court first notes that Bouknight's response to the defendants' summary judgment motion does not constitute competent summary judgment evidence because it is unsworn and the factual allegations within were not declared under penalty of perjury to be true and correct (Dkt. 54). *See Davis v. Hernandez*, 798 F.3d 290, 291 (5th Cir. 2015); *see also Larry v. White*, 929 F.2d 206, 211 n. 12 (5th Cir. 1991) ("Unsworn pleadings, memoranda, or the like are not, of course, competent summary judgment evidence."). Moreover, Bouknight's response, which contains only one page of substantive argument, neither includes any competent supporting evidence nor specifically refers to any such evidence in the summary judgment record. Even a *pro se* plaintiff must specifically refer to evidence in the summary judgment record in order to put that evidence properly before the court. *Outley v. Luke & Associates, Inc.*, 840 F.3d 212, 217 (5th Cir. 2016). Bouknight, in effect, has presented no summary judgment evidence.

That said, Bouknight declared under penalty of perjury that the facts set forth in his amended complaint were true and correct, so the amended complaint constitutes competent summary judgment evidence (Dkt. 33 at p. 7). *See Hart v. Hairston*, 343 F.3d 762, 765 (5th Cir. 2003) ("On summary judgment, factual allegations set forth in a verified complaint may be treated the same as when they are contained in an affidavit."). Because Bouknight is proceeding *pro se*, the Court will consider the amended complaint even though Bouknight's summary judgment response does not specifically refer to it. *See Davis*, 798 F.3d at 293 ("[F]ederal courts, this one included, have a traditional disposition of leniency toward *pro se* litigants.") (quotation marks omitted). Bouknight's amended complaint also incorporates by reference his original complaint and its attachments, so the Court will consider them as well. The attachments include unsworn declarations from other inmates. *See* 28 U.S.C. § 1746.

Bouknight's evidence, taken as true, establishes that "[s]everal" tables in the chow hall broke in the five-year period before Bouknight's fall (Dkt. 1-1 at pp. 8, 9). One inmate testified that he has seen five tables collapse but does not provide a timeframe (Dkt. 1-1 at p. 10). If taken as true, Bouknight's evidence further establishes that years of corrosion caused some tables, including the table that injured Bouknight, to fall over (Dkt. 1-1 at pp. 8, 9, 10). But Bouknight does not provide any evidence—apart from conclusory, unsubstantiated statements—that these particular defendants were aware of facts from which they could infer an excessive risk to prisoner safety, let alone that they made such an

inference. Rather, one of Bouknight's fellow inmates testified in his declaration that "the Warden and staff of this unit were well aware of the ongoing problem yet failed to address the issue *until someone got hurt*" (Dkt. 1-1 at p. 10) (emphasis added). That "someone" is Bouknight; so Bouknight's evidence establishes, if anything, that the defendants simply misgauged the risk posed by the corrosion because several tables had fallen without hurting anyone. There is indeed no evidence in the record that any other inmate has ever been injured by a falling table, either before or after Bouknight's accident. For that matter, there is no evidence (again, other than conclusory, unsubstantiated statements) that these particular defendants even knew about the falling tables. Viewed in the light most favorable to Bouknight, Bouknight's evidence shows, at most, that the defendants were negligent and mistaken in their assessment of a particular risk—in fact, Bouknight's supporting declarations tellingly characterize the defendants' conduct as "negligence" (Dkt. 1-1 at pp. 6, 8, 9, 10).

Ultimately, Bouknight has not presented any evidence that Roesler, Dudley, Hill, Word, and Sanders knowingly exposed him to and consciously disregarded a substantial risk of serious harm. These claims fail as a matter of law.

## IV.   BOUKNIGHT HAS NOT PRESENTED EVIDENCE OF DELIBERATE INDIFFERENCE TO HIS SERIOUS MEDICAL NEEDS.

Bouknight seeks relief under the Eighth Amendment against Strunk, Dr. Owusu, and Abraham for what he alleges was the unconstitutional denial of medical care. Bouknight has also sued Hill because Hill was on duty in the chow hall at the time of the accident and

"failed to take [Bouknight] to the infirmary or initiate an accident report" (Dkt. 33 at p. 6).
These claims are also governed by the deliberate-indifference standard.

### A.    Prisoners and medical care—the legal standard

A prisoner may succeed on a claim under 42 U.S.C. § 1983 for inadequate medical
care only if he demonstrates "deliberate indifference to serious medical needs" on the part
of prison officials or other state actors. *Estelle*, 429 U.S. at 104. The conduct alleged must
"constitute an unnecessary and wanton infliction of pain" or "be repugnant to the conscience
of mankind." *Id.* at 104–06 (quotation marks omitted). The prisoner must first prove
objective exposure to a substantial risk of serious harm. *Gobert v. Caldwell*, 463 F.3d 339,
345–46 (5th Cir. 2006). To then prove subjective deliberate indifference to that risk, the
prisoner must show both: (1) that the defendant was aware of facts from which the inference
of an excessive risk to the prisoner's health or safety could be drawn; and (2) that the
defendant actually drew the inference that such potential for harm existed. *Farmer*, 511 U.S.
at 837; *Harris v. Hegmann*, 198 F.3d 153, 159 (5th Cir. 1999). This is an "extremely high
standard to meet"—*Domino*, 239 F.3d at 756—and, absent exceptional circumstances, it is
not met by an incorrect diagnosis, unsuccessful medical treatment, acts of negligence,
medical malpractice, or a prisoner's disagreement with his medical treatment. *Id.*; *Gobert*,
463 F.3d at 346. Rather, the prisoner must show that the defendant "refused to treat him,
ignored his complaints, intentionally treated him incorrectly, or engaged in any similar
conduct that would clearly evince a wanton disregard for any serious medical needs."

*Brewster*, 587 F.3d at 770 (quotation marks omitted).

"Deliberate indifference is not established when medical records indicate that the plaintiff was afforded extensive medical care by prison officials." *Brauner v. Coody*, 793 F.3d 493, 500 (5th Cir. 2015) (quotation marks and brackets omitted). The Constitution does not require that prisoners receive optimal care, and the fact that a prisoner's medical treatment "may not have been the best that money could buy" is insufficient to establish a Constitutional claim. *Mayweather v. Foti*, 958 F.2d 91 (5th Cir. 1992); *see also Gobert*, 463 F.3d at 349 ("[D]eliberate indifference exists wholly independent of an optimal standard of care."); *McMahon v. Beard*, 583 F.2d 172, 174 (5th Cir. 1978) ("[The] plaintiff stated that he had not received 'optimum' or 'best' medical treatment. Were this the legal standard, a trial of the issues might be required.").

### B.   Bouknight's claims and evidence

As is the case with his indifference-to-safety claims, Bouknight provides no evidence to support his allegations of deliberate indifference to his serious medical needs; and his medical records rebut those allegations. *See Brauner*, 793 F.3d at 498–500.

Bouknight's records show that the Terrell Unit medical personnel were attentive and responsive to his requests for treatment stemming from the accident, to the point where they unexpectedly discovered a potentially dangerous medical condition unrelated to the fall. Bouknight saw Dr. Owusu on November 8, 2011, the day after his fall; in an I-60 form, Bouknight claimed that he told Dr. Owusu about the fall and that Dr. Owusu prescribed him

pain medication on November 8, though the actual medical chart from that clinic visit does not reflect either the conversation or the prescription (Dkt. 52-3 at pp. 72, 172).[5] Bouknight requested immediately after the fall that a report detailing the incident be placed in his medical file, and he was told to report to the unit medical department to submit such a report (Dkt. 52-3 at p. 172). It is unclear from the record whether Bouknight ever followed up. When Bouknight told Dr. Owusu the following March that the fall had "aggravated his chronic lower back and left knee pain[,]" Dr. Owusu prescribed pain medication, an anti-inflammatory drug, and a muscle relaxant and referred Bouknight to the University of Texas Medical Branch at Galveston ("UTMB") for x-rays of his left knee and lumbar region (Dkt. 52-1 at p. 3; Dkt. 52-3 at pp. 70, 214, 216). Notably, although the x-rays provided no remarkable findings regarding the knee and back, they revealed the possible presence of an abdominal aortic aneurysm (Dkt. 52-3 at p. 216). When Dr. Owusu learned of the possible aneurysm, he submitted an urgent referral for an abdominal CT scan or ultrasound to confirm the diagnosis (Dkt. 52-3 at p. 68). Bouknight, for some reason, refused to be taken to UTMB for the diagnostic tests, even though Abraham "[c]ounseled [him] extensively" to undergo them because an undetected, untreated aneurysm could lead "to sudden bleeding and death" (Dkt. 52-3 at pp. 19, 35, 37, 127).

The Court also notes that Bouknight's medical records show attentive treatment and extensive accommodations that were not directly related to the accident. Bouknight, who was

---

[5]     The medical chart from the November 8 clinic visit reflects that Dr. Owusu treated Bouknight for a rash (Dkt. 52-3 at pp. 72, 73).

61 when he fell in the chow hall, suffered at the time of his fall from hypertension; hyperlipidemia; chronic obstructive pulmonary disease; non-insulin-dependent diabetes; coronary artery disease; vertigo; and chronic lower back and left knee pain (Dkt. 52-3 at pp. 40, 42, 70). At the time of the fall, he had been issued passes for a walker; a walker bag; a wrist splint; a knee strap; a long-handled toothbrush; and knee-high TED hose (Dkt. 52-3 at pp. 23, 171). The passes were renewed multiple times (Dkt. 52-3 at pp. 5, 7, 14, 18, 21). Several months after the fall, Bouknight was also given a pass to wear his shirt untucked because he claimed to be suffering from arthritis in a surgically repaired shoulder (Dkt. 52-3 at pp. 9, 66). When Bouknight asked for an x-ray of that injured shoulder, the x-ray was performed three days later; and the results ("Unremarkable") were conveyed to Bouknight in response to a sick call request two weeks after the x-ray (Dkt. 52-3 at pp. 130, 131, 133, 213).

Judging from his live complaint, Bouknight's claims against Strunk, Dr. Owusu, and Abraham are rooted in their alleged refusal to prescribe "adequate" pain medication for him; provide a back brace for him and a seat cushion for his walker; and perform MRIs instead of x-rays (Dkt. 33 at p. 6). However, by all indications, all decisions regarding the provision of additional care to Bouknight were based on medical judgment, and an inmate's simple disagreement with the exercise of such judgment does not state a claim for Eighth Amendment indifference to medical needs. *Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir. 1997); *see also Gobert*, 463 F.3d at 346 ("Furthermore, the decision whether to provide

additional treatment is a classic example of a matter for medical judgment.") (quotation marks omitted); *Brauner*, 793 F.3d at 498–500. For instance, the responses to Bouknight's requests for a seat cushion for his walker state that the requests were refused because the cushion was "not indicated medically," a conclusion that was based on the very same medical evaluation that resulted in Bouknight's being *granted* a pass to wear his shirt untucked (Dkt. 52-3 at pp. 66, 141, 146). Based on the evaluation, one request was granted, while the other was refused—a textbook example of the exercise of medical judgment. Moreover, when Bouknight requested a second opinion on the seat cushion, an appointment was made for him to receive that second opinion; and he was a no-show for that appointment (Dkt. 52-3 at pp. 60, 138, 139, 140). Bouknight makes the uncorroborated claim that an x-ray showed damage to discs in his lower back (Dkt. 33 at p. 6); but the only x-ray of Bouknight's back that is contained in his medical records is the lumbar x-ray for which Dr. Owusu referred him, which found "[n]o significant degenerative changes" and showed that his vertebrae "[we]re in normal alignment" (Dkt. 52-3 at p. 216). Even if there were an x-ray showing disc problems, its existence would prove nothing without facts showing the requisite wanton disregard for Bouknight's medical needs—Bouknight does not present any evidence showing that any of the defendants so much as saw the purported x-ray, much less that they reacted to seeing it in a way that constituted deliberate indifference.

There is also no evidence that Hill acted with deliberate indifference. Bouknight claims that Hill "failed to take [Bouknight] to the infirmary or initiate an accident report"

when Bouknight fell (Dkt. 33 at p. 6). That failure alone is not evidence of deliberate indifference. It is true that, "[u]nder exceptional circumstances, a prison official's knowledge of a substantial risk of harm may be inferred by the obviousness of the substantial risk." *Hegmann*, 198 F.3d at 159 (quotation marks omitted). But there is no evidence that Bouknight's fall caused such obviously serious injuries that a failure to take him immediately to the infirmary constituted an Eighth Amendment violation. As discussed previously, Bouknight had an unremarkable clinic visit with Dr. Owusu the next day; and x-rays of Bouknight's lumbar spine and left knee showed no fractures or other signs of serious injury (Dkt. 52-3 at pp. 72, 73, 172, 214, 216).

Bouknight has presented no evidentiary support for his claims under the Eighth Amendment against Strunk, Dr. Owusu, Abraham, or Hill for deliberate indifference to serious medical needs. These claims fail as a matter of law.

## V.    BOUKNIGHT HAS NOT PRESENTED EVIDENCE OF CONSTITUTIONAL VIOLATIONS BY RIVAS.

Bouknight claims that Rivas "[f]ailed to answer" Bouknight's grievances and other requests for relief and information regarding the accident, "imped[ing Bouknight's] ability to exhaust his administrative remedies" (Dkt. 33 at pp. 3, 6). The nature of Bouknight's claims for relief against Rivas is a bit unclear, but there is no evidence that Rivas's responses (or failure to respond) to Bouknight's grievances and requests violated Bouknight's Constitutional rights. Bouknight "does not have a federally protected liberty interest in having [his] grievances resolved to his satisfaction." *Geiger v. Jowers*, 404 F.3d 371, 374

-17-

(5th Cir. 2005). And to the extent that he is trying to assert a claim for denial of access to the courts, Bouknight must show that Rivas acted intentionally (as opposed to negligently) and prevented him from bringing an arguable, nonfrivolous legal claim challenging his conviction or conditions of confinement. *Christopher v. Harbury*, 536 U.S. 403, 415–16 (2002); *Jones v. Greninger*, 188 F.3d 322, 325 (5th Cir. 1999); *Richardson v. McDonnell*, 841 F.2d 120, 121–22 (5th Cir. 1988). Bouknight has not pointed to evidence of intentional conduct by Rivas, and he has not spelled out an arguable legal claim that was foreclosed by Rivas.

## VI.   CONCLUSION

Based on the foregoing, the Court **ORDERS** as follows:

1.   The defendants' motion for summary judgment (Dkt. 52) is **GRANTED**, and all claims against them are dismissed with prejudice.

2.   Any other pending motions are **DENIED** as moot.

The Clerk is directed to provide a copy of this order to the parties and to *amicus* counsel.

SIGNED at Galveston, Texas on _____March 22_____, 2017.

_____
GEORGE C. HANKS, JR.
UNITED STATES DISTRICT JUDGE

-18-